**SPRINGS WINDOW FASHIONS LP, Shade–O–Matic Ltd., and Manor Tec, Inc., Plaintiffs–Appellants,**

v.

**NOVO INDUSTRIES, L.P., Defendant–Cross–Appellant.**

Nos. 02–1309, 02–1347.

United States Court of Appeals, Federal Circuit.

Feb. 13, 2003.

Roy H. Wepner, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, of Westfield, New Jersey, argued for plaintiffs-appellants. With him on the brief was John R. Nelson. Of counsel was Scott E. Charney.

James H. Riley II, Shook, Hardy & Bacon L.L.P., of Houston, Texas, argued for defendant-cross appellant. With him on the brief was William P. Jensen.

Before MAYER, Chief Judge, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

Springs Window Fashions L.P., Shade–O–Matic Ltd., and Manor Tec, Inc., (collectively, "Springs") appeal from an order of the United States District Court for the Western District of Wisconsin granting the motion of Novo Industries, L.P., for summary judgment of noninfringement of United States Patent No. 6,178,857 ("the '857 patent"). Novo cross-appeals the grant of summary judgment dismissing its counterclaims of tortious interference and disparagement based on bad faith enforcement of the '857 patent. We affirm the summary judgment as to both the claim of infringement and the counterclaims of tortious interference and disparagement.

I

The '857 patent, which was assigned to Shade–O–Matic and then licensed to

Springs Window Fashions, relates to a method of trimming window blinds. Because windows vary in size, there is a benefit to being able to customize the window blinds. While a retail store could order custom-sized blinds from a factory, another approach is for the retail store to order stock sizes of blinds and cut them to the appropriate size at the time of purchase. Manufacturers such as Springs provide retail stores with both the stock sizes of blinds and "cut-down" machines that can trim the head rail, slats, and bottom rail of window blinds. The '857 patent recites a method used in connection with such a cut-down machine.

Independent claim 1 of the '857 patent is the only independent claim. It provides:

1. A method of trimming the width of venetian blinds of the type having a head rail, a plurality of slats and a bottom rail, each of said head rail, said slats and said bottom rail having first and second opposed ends, said method comprising the steps of:

placing a first end of said head rail of said venetian blind through a corresponding head rail opening in a support body and placing a first end of said bottom rail and a first end of said slats through respective openings in said support body, whereby respective first ends of said head rails said bottom rail and said slats extend through said openings;

moving said first ends of said head rails said bottom rail and said blind slats through said openings in said support body and into respective aligned further openings in *a cutting means, said cutting means including a first cutter for cutting said head rail and a separate second cutter for cutting at least said slats;* and,

moving said first and second cutters to cut at least said head rail, and said slats.

'857 patent, col. 12, l. 66, to col. 13, l. 18 (emphasis added). One of the embodiments illustrated in the specification uses a die plate that slides diagonally to cut the head rail and a blade mounting frame that moves horizontally to cut the slats. *See* '857 patent, figures 1–7.

On July 16, 2001, Springs filed suit charging Novo with infringing claims 1, 2, 8, and 10 of the '857 patent through the manufacture and sale of cut-down machines that employ the claimed methods. In Novo's accused device, a single plate with multiple blades cuts the head rail, bottom rail, and slats. The plate has a series of openings for the rails and slats, and it has blades that correspond to the openings. When the plate is moved, the blades cut the rails and slats. Novo moved for summary judgment, arguing that its device did not employ "separate" cutters within the meaning of the asserted claims.

The district court granted Novo's motion. The court construed the term "separate" to mean capable of independent movement. The court rejected Springs's contention that "separate" means simply different cutting surfaces. Springs's construction, according to the district court, would render the term "separate" superfluous in the phrase "separate second cutter" in light of the presence of the word "second." Instead, the court looked to dictionary definitions of the term "separate," including "detached, disconnected or disjoined," to conclude that the cutters must "have the potential for independent movement." The court further held that the specification and prosecution history of the '857 patent confirmed that the inventor intended to limit the claimed invention

to detached and independently moveable cutters.

In light of that claim construction, the district court held that there was no genuine issue of material fact as to whether Novo's machines infringed, because Novo's device did not have two cutters that were moveable independently of one another. Instead, the blades in the Novo machine were all attached to the same plate, and when that plate moved so did all the blades.

## II

Springs argues that the district court erred in its claim construction and therefore erred in granting summary judgment to Novo. According to Springs, the term "separate" does not require the cutters to be independently movable, but only requires that the machine have distinct cutting edges. Thus, in Springs's view, the term "separate" distinguishes the claimed cutting means from a single, unbroken cutting edge that cuts the head rail and then the slats.

While the claim language and specification may only allow, rather than dictate, the court's construction of the term "separate," the prosecution history of the '857 patent confirms that the district court's interpretation is correct. In the first official action, the examiner rejected all of the original claims on several grounds, including that they were either anticipated by or obvious in light of U.S. Patent No. 5,816,126 to Pluber. The Pluber patent claims a device in which three blades are mounted on one sliding support plate, which is moved by a lever. The head rail, slats, and the bottom rail are cut by these three blades simultaneously as part of a single motion. The examiner explained that

> Pluber discloses the same invention [as applicant], a method of trimming the width of Venetian blinds, as claimed in-

cluding the steps of: placing a selected end of the head rail, bottom rail and the blind slats through corresponding ... slat openings in a support body ...; placing the selected ends of the head rail, bottom rail and the blind slats through aligned corresponding openings in a cutting means ...; moving the cutting means to cut the head rail, bottom rail, and blind slats.

The applicant submitted an amendment modifying the claims, distinguishing Pluber from the claimed invention, and arguing that Pluber was not prior art because it postdated the grandparent application. The applicant's accompanying remarks noted that extra effort is required to cut the head rail because of its steel construction. The applicant stated: "It is for this reason that the Applicant provides two entirely separate movement means, one for cutting the head rail and the other for cutting the bottom rail and the blind slats." In amending claim 1, the applicant replaced the language "a cutting means" with "a cutting means, said cutting means including a first cutter for cutting said head rail and a separate second cutter for cutting at least said slats." The applicant also modified the specification to include the language "with the cutting stroke of the bottom rail and the blind slats be[ing] performed independently of the cutting stroke of the headrail cutting means."

In distinguishing the '857 claims from the Pluber patent, the applicant stated:

> Pluber discloses a somewhat simplistic form of guillotine cutter. All of the blades are mounted on a *single* plate ... operated by a single arm 55. The *single* plate 22 carries three blades, one for cutting the head rail, one for cutting the blind slats and one for cutting the bottom rail. . . . Pluber does not provide two separate cutters for cutting (1) the

blind slats and bottom rail, and (2) the head rail. Operation of Pluber would require a very considerable manual effort. He shows only one movement arm. This has to move all three cutting blades.... The present invention has been devised to avoid this problem by providing one cutter for the head rail and a separate cutter for the bottom rail and slats.

In the second official action, the examiner continued to reject claim 1 and the other claims as anticipated by the Pluber patent or obvious in light of it. The examiner rejected the applicant's contention that Pluber lacked two separate cutters, noting that "[e]ach of the cutters ... are separably mounted to the plate 22 and separately cut a portion of the blinds. Therefore, the phrase 'a first cutter ... and a separate second cutter' does not distinguish the instant application from the Pluber reference even though the cutters ... are all mounted to the single plate 22."

In response to that office action, the applicant argued that Pluber was not a prior art reference. In addition, the applicant adhered to his argument distinguishing his invention from Pluber:

Applicant maintains the arguments set forth in the prior Amendment concerning distinguishing of Pluber from the claims previously presented, on the merits. However, in light of the Examiner's concession that Claim 1 finds full support in the application filed September 11, 1995, it is not believed necessary to go any further than to point out that fact and request a Notice of Allowance.

The examiner issued a notice of allowance without further comment.

■ It is well established that "the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Pall Corp. v. PTI Techs.*

*Inc.*, 259 F.3d 1383, 1392, 59 USPQ2d 1763, 1769 (Fed.Cir.2001); *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed. Cir.1995); *see also Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304, 41 USPQ2d 1364, 1368 (Fed.Cir.1997) ("[B]y distinguishing the claimed invention over prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."). The disclaimer, however, must be effected with "reasonable clarity and deliberateness." *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294, 55 USPQ2d 1065, 1075 (Fed.Cir.2000).

■ Springs concedes that the applicant amended the claims to include the word "separate" in an effort to distinguish the invention from Pluber. We agree with the district court that, in distinguishing Pluber, the applicant disclaimed a single plate with multiple blades or cutting edges on that single plate. The applicant specifically noted that the claimed method provided "separate movement means," thus restricting "separate" cutters to those cutters capable of independent movement.

The district court correctly stated that Novo's single plate with attached blades is "similar to the blade configuration of the preferred embodiment in Pluber." Given that the Pluber reference and Novo's device are nearly identical with respect to the arrangement of their cutting edges, it is clear that the applicant disclaimed coverage of Novo's device.

Springs contends that the examiner did not agree that the amended claims distinguished over Pluber and that the claims therefore should not be limited based on the applicant's argument that they did. Springs argues that the examiner allowed the claims based on an entirely distinct rationale: that Pluber was not prior art.

In fact, it is not clear from the record why the examiner allowed the claims. While the examiner expressed doubt in the second office action that the amended language of the claims was sufficient to distinguish over Pluber, it is not clear that the examiner adhered to that position at the time of allowance. The notice of allowance offers no explanation of the examiner's reasoning.

■ In any event, the examiner's remarks do not negate the effect of the applicant's disclaimer. In *Desper Products, Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1336, 48 USPQ2d 1088, 1096 (Fed. Cir.1998), when the applicant amended the claims and made accompanying remarks to overcome a rejection based on another patent, we stated that the fact that "the prosecution shifted to a different focus does not blunt the impact of those remarks made to overcome the prior rejection." *See also Laitram Corp. v. Morehouse Indus., Inc.,* 143 F.3d 1456, 1462, 46 USPQ2d 1609, 1614 (Fed.Cir.1998) ("Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms.... The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction."). Because an examiner has the duty to police claim language by giving it the broadest reasonable interpretation, *see In re Hyatt,* 211 F.3d 1367, 1372, 54 USPQ2d 1664, 1667 (Fed.Cir.2000), it is not surprising that an examiner would not be satisfied with the applicant's insistence that particular claim language distinguishes a prior art reference, but that a court would later hold the patentee to the distinction he pressed during prosecution.

■ The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement. "The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct.... Were we to accept [the patentee's] position, we would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies." *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 957, 55 USPQ2d 1487, 1491 (Fed.Cir. 2000). *See also Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1577 (Fed.Cir.1996) ("the claims, specification, and file history ... constitute the public record of the patentee's claim, a record on which the public is entitled to rely"). In this case, a reasonable competitor, reviewing the amendments and statements made by the applicant to distinguish the claimed invention from Pluber, would conclude that the claimed invention did not cover a device like Pluber's. If the applicant mistakenly disclaimed coverage of the claimed invention, then the applicant should have amended the file to reflect the error, as the applicant is the party in the best position to do so. The applicant, however, never retracted any of his statements distinguishing Pluber nor did he acquiesce in the examiner's comments regarding the overlapping scope of Pluber. Springs therefore must be held to the restrictive claim construction that was argued during prosecution.

■ We are also unpersuaded by Springs's argument that the statements

made during prosecution should be disregarded because the distinguishing features "were not and are not reflected in the claims" and thus the statements simply constituted an error by the prosecuting attorney that should not be binding on the applicant. Here, as in *Hockerson–Halberstadt*, there is no indication that the detailed distinction of Pluber was simply an inadvertent misstatement by the prosecuting attorney for which the applicant should be given a mulligan. The statements distinguishing Pluber were detailed, consistent, and repeated. A reasonable competitor would have believed that the applicant's disclaiming statements were not a mere mistake. This case is thus distinguishable from *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1348, 58 USPQ2d 1737, 1741–42 (Fed.Cir.2001), in which the court held that "a person of reasonable intelligence would not be misled into relying on [an] erroneous statement" made during prosecution because the statement was contrary to the plain language of the claims and specification as well as other statements in the same document. As in *Desper Products*, we are interpreting claim language, not importing limitations into the claim. There is nothing in the prosecuting attorney's remarks that is at odds with anything in the specification or the claims.

■ Lastly, Springs contends that the district court's claim construction had the effect of excluding one of the embodiments in the '857 patent, illustrated in Figures 8 through 10, and thus cannot be correct. The district court, however, concluded that the embodiment was consistent with its construction requiring capacity for independent movement. The court stated that the use of the word "synchronism" in the specification to describe this embodiment "implies a capacity for independent move-

ment since that term is generally applied only to independently movable members that are compelled to move coincidentally." The court thus determined that the embodiment in Figures 8 through 10 discloses "independently movable cutters, though they are configured to move sequentially in response to a single manual control."

We reject Springs's argument that Figures 8 through 10 require a claim construction different from that employed by the district court. First, we have adopted claim constructions excluding an embodiment when the prosecution history requires the claim construction because of disclaimer. *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327, 61 USPQ2d 1368, 1373–74 (Fed.Cir.2002). Second, we agree with the district court that the construction of the term "separate" to mean independently moveable does not exclude the embodiment in Figures 8 through 10. The lost motion linkage in that embodiment causes the two cutters to move sequentially: the head rail is first cut and then after the arm rotates further the slats are cut, thus providing a mechanical advantage. One could move the handle some distance to cause the die plate to move and cut the head rail, stop pushing the handle, and thus not move the blade and not cut the slats. In each of the remaining embodiments the cutters are unconnected and independently moveable.

Because the patentee explicitly stated during prosecution that his claims differed from a single plate with multiple cutting edges, we construe the disputed claims to exclude the disclaimed single plate device. Based on that construction, we uphold the district court's grant of summary judgment of noninfringement and denial of summary judgment of infringement.

### III

Novo argues that the district court erred in dismissing its counterclaims for

tortious interference and disparagement. In those counterclaims, Novo alleged that Springs made wrongful accusations of infringement against Novo to Novo's prospective and current customers and that Springs was either aware of, or acted with reckless disregard for, the noninfringement or unenforceability of the '857 patent. The counterclaims required proof of bad faith enforcement of the patent, *see Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353, 51 USPQ2d 1337, 1347 (Fed.Cir.1999), and the district court concluded that Novo failed to raise a genuine issue of material fact with regard to that issue.

## A

■ During the summary judgment proceedings, Novo requested a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, in part for the purpose of obtaining deposition evidence from representatives of Springs Window Fashions. According to Novo, the district court abused its discretion when it denied Novo's request for a Rule 56(f) continuance. We disagree.

■ Rule 56(f) permits a nonmoving party to submit an affidavit requesting a continuance if further discovery is required to oppose a motion for summary judgment. On such discovery issues, this court applies the law of the regional circuit. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807, 53 USPQ2d 1289, 1297 (Fed.Cir.1999). The Seventh Circuit employs the abuse of discretion standard in reviewing a district court's decision to deny a party's Rule 56(f) motion. *See Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049 (7th Cir.2000). Novo argues that the district court erred when it entered summary judgment on the counterclaims before the completion of discovery

and before Novo was able to conduct its noticed deposition.

The district court entered its order dismissing Novo's counterclaims for tortious interference and disparagement on March 8, 2002. The court denied Novo's Rule 56(f) request because the court concluded that Novo had failed to pursue its counterclaims diligently and that there was no reason to believe any pending discovery would reveal evidence of Springs's bad faith. The court found that "[p]laintiffs asserted a plausible interpretation of the patent supported by opinion of counsel which plaintiff appears to have genuinely embraced." In addition, the court noted that Novo "amended its complaint to add the counterclaims although it could readily have asserted them in its original answer. It has not proceeded promptly to pursue discovery of the issue." In sum, the court concluded that "[c]onsidering the unlikelihood that additional discovery will expose anything to keep these counterclaims alive, and defendant's limited pursuit of the claims to date, there is no justification for a Rule 56(f) continuance."

■ The district court did not abuse its discretion in finding that Novo was not diligent in its pursuit of the counterclaims and that Novo therefore did not establish its entitlement to a continuance. "When a party fails to secure discoverable evidence due to his own lack of diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information." *Kalis*, 231 F.3d at 1058 (quoting *Pfeil v. Rogers*, 757 F.2d 850, 857 (7th Cir.1985)). In this case, Novo failed to proceed with diligence first in filing the counterclaims and then in pursuing discovery, including scheduling the deposition at issue.

Novo filed its original answer on August 10, 2001, but waited until December 28, 2001, to file a motion for leave to amend its

answer and add the counterclaims of tortious interference and disparagement, even though Novo has conceded that it had knowledge of facts sufficient to plead the counterclaims as early as September 26, 2001. The three-month delay is not insignificant, especially considering the fact that discovery was scheduled to be completed less than three months after Novo filed its motion for leave to amend. It is inconsequential whether the district court erred in finding that Novo could have asserted the counterclaims in the original answer filed in August; Novo concedes that it could have done so at least as early as September 26, 2001.

Additionally, by September 6, 2001, Novo was aware that the court expected all motions for summary judgment to be filed no later than February 1, 2002, and for responses to be filed within 20 days thereafter. Thus, although discovery was not scheduled to close until March 15, 2002, Novo was on notice that if Springs chose to move for summary judgment on the counterclaims, Novo would have to be prepared to respond by February 21. While Novo deposed Shade–O–Matic's representatives on February 20, the earliest date that Novo scheduled Springs Window Fashions' deposition was March 1. Thus, even though Springs moved for summary judgment on February 1, 2002, and Novo's response to that motion was due on February 21, Novo did not schedule the Springs Window Fashions deposition in time to incorporate that deposition into its response. Novo blames Springs Window Fashions for Novo's failure to complete the deposition in time because Springs Window Fashions rescheduled the March 1 deposition for the week of March 11. However, the real cause of Novo's inability to incorporate the deposition results in its response to the summary judgment motion was its own conduct in scheduling the deposition so late in the first place. While it

is unfortunate that Springs did not give the opinion of counsel letter to Novo in response to document requests and waited until March 4 to produce it, Novo was not without blame in failing to discover pertinent evidence in a timely manner.

Furthermore, "[a] party who has been dilatory in discovery may not use Rule 56(f) to gain a continuance where he has only made vague assertions that further discovery would develop genuine issues of material fact." *United States v. Bob Stofer Oldsmobile–Cadillac, Inc.*, 766 F.2d 1147, 1153 (7th Cir.1985). *See also Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir.1996) ("This Court has noted that the party seeking further time to respond to a summary judgment motion must give an adequate explanation to the court of the reasons why the extension is necessary."). Novo fails to explain what reasonable basis it has to believe that the deposition or other discovery efforts in that remaining week would have led to evidence of bad faith on the part of Springs Window Fashions. Novo has offered nothing to support a reasonable belief that the deposition would have led to damaging admissions regarding the counterclaims. None of the other discovery conducted by Novo, including a deposition of Shade–O–Matic, had produced any such admissions or other evidence of bad faith.

Novo contends that the information it needed to answer the summary judgment motion was solely in the possession of Springs because it went to state of mind. Novo now argues that the Springs Window Fashions deposition was important in part because it would have revealed the timing of the opinion of counsel letter relative to Springs's contacts with Novo's customers. But there were other sources for some of that information, including the customers themselves. Not all of the information

noted by Novo was within the exclusive control of Springs, yet there is no evidence in the record that Novo sought to obtain or succeeded in obtaining such evidence from its customers.

Accordingly, we conclude that the trial court did not abuse its discretion by denying the request for a continuance to allow further discovery before ruling on the motion for summary judgment on the counterclaims.

### B

■ As to the merits of the grant of summary judgment, Novo argues that there was a genuine issue of material fact on the issue of bad faith. Novo relies on a license agreement between Shade–O–Matic and Novo and allegations of inequitable conduct in contesting the grant of summary judgment. We reject both elements of Novo's argument and conclude that the evidence before the district court negated, rather than supported, bad faith.

■ The law "recognizes a presumption that the assertion of a duly granted patent is made in good faith ...; this presumption is overcome only by affirmative evidence of bad faith." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371, 64 USPQ2d 1911, 1918 (Fed.Cir.2002) (citations omitted). To avoid summary judgment, a party claiming bad faith patent enforcement "must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial." *Id.* Novo failed to meet its burden of putting forward affirmative evidence of bad faith.

The evidence negating bad faith includes a June 2001 opinion letter procured by Springs that supports Springs's claim that Novo infringed the '857 patent. The dis-

trict court correctly determined that "all evidence indicates that plaintiffs genuinely believed that their proposed interpretation of the patent was correct and that defendant was infringing." The district court did not have before it any evidence to the contrary.

Novo contends that Springs should have known that the '857 patent might be covered by a license agreement between Shade–O–Matic and Novo when Springs communicated with the customers and that the evidence of the license raises a genuine issue of fact of Springs's bad faith. Novo asks us to infer that Springs believed the license agreement included the '857 patent and covered the alleged infringing activity. The pertinent evidence, however, points away from that inference. First, the '857 patent appears to claim a method that applies to horizontal, and not vertical, blinds, while the license appears to limit itself to the cutting of vertical blinds, including vertical tracks and vanes. Even though the specification of the '857 patent does discuss how the invention may be used on vertical blinds, the specification also notes that vertical blinds do not contain a bottom rail. Novo concedes that this is true. Claim 1 of the '857 patent, however, includes the limitations of "placing a first end of said bottom rail ... through respective openings" and "moving ... said bottom rail." Novo fails to raise a genuine issue regarding whether the '857 patent covers the cutting of vertical blinds and thus whether the patent is included under the license. Second, there was no evidence that anyone believed the license agreement covered the cutting of horizontal blinds. Shade–O–Matic's representative stated in his deposition that he believed that the license covered only vertical blinds. Novo's corporate representative stated in his deposition that he understood the licensing agreement to cover vertical cut-down machines and said he had no

belief as to whether it also covered horizontal cut-down machines, stating that "[i]t's just not real clear." With regard to whether the agreement included the '857 patent, he stated that he did not "have a belief one way or the other. It's just unclear to me." In the face of evidence that Novo's representative did not have an affirmative belief that the license covered the '857 patent, Novo asserts that a reasonable fact-finder could conclude that Springs had such a belief. That assertion, however, is unsupported by evidence, and the district court therefore properly entered summary judgment against Novo on that issue.

 Novo also contends that it has raised a genuine issue of material fact regarding Springs's bad faith enforcement of the patent through its allegations that Springs knew the '857 was unenforceable due to inequitable conduct. Again, we disagree. We have stated that a "threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith" in a threat to enforce patent rights. *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897, 49 USPQ2d 1308, 1312 (Fed.Cir.1998). *See Golan*, 310 F.3d at 1371, 64 USPQ2d at 1918 ("[I]f the party challenging such statements ... presents clear and convincing evidence that the infringement allegations are objectively false, and that the patent made them in bad faith, viz., with knowledge of their incorrectness or falsity, or disregard for either, the statements are actionable and are not protected by the existence of a patent."). We conclude that Novo has not raised a genuine issue of fact on the issue of unenforceability and thus has not satisfied the threshold requirement for showing bad faith. In September 2001 the district court dismissed Novo's counterclaim of inequitable conduct, and in January 2002, the court denied Novo's at-

tempts to add inequitable conduct as a defense. Additionally, the court struck from the record Novo's expert report as it related to inequitable conduct. Novo thus has failed to point to any evidence in the record that raises a genuine issue of material fact as to inequitable conduct sufficient to make the '857 patent unenforceable and raise an issue as to Novo's bad faith.

We conclude that Novo presented no evidence that would support a finding that Springs knew that it was enforcing an unenforceable patent or that Springs had no reason to believe that Novo did not infringe the '857 patent. Therefore, we affirm the district court's grant of summary judgment to Springs on Novo's counterclaims of tortious interference and disparagement.

Each party shall bear its own costs for this appeal.

*AFFIRMED.*