**NATIONAL INSTRUMENTS CORPORATION,
Plaintiff,**

v.

**ENSOFT CORPORATION, Defendant.**

No. 4:06–CV–551.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 30, 2011.

---

Daniel R. Rosenberg, Briggs & Morgan PA, Minneapolis, MN, Megan Flynn, David A. Tank, Dorsey & Whitney LLP, Des Moines, IA, for Defendant.

David M. Barkan, Enrique D. Duarte, Michael R. Headley, Fish & Richardson PC, Redwood City, CA, Ryan T. Beard, Dwayne K. Goetzel, Myertons Hood Kivlin Kowert & Goetzel PC, Austin, TX, Ross W. Johnson, Faegre & Benson LLP, Des Moines, IA, Frank E. Scherkenbach, Fish & Richardson PC, Boston, MA, Thomas S. McClenahan, Fish & Richardson PC, Minneapolis, MN, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Currently before the Court is "Defendant's Motion for Summary Judgment," filed by EnSoft Corporation ("EnSoft") on February 10, 2011. Clerk's No. 93. Plaintiff National Instruments Corporation ("National Instruments") filed a response in opposition to the motion on April 28, 2011.[1] Clerk's No. 105. EnSoft filed a reply on June 22, 2011. Clerk's No. 117. National Instruments filed a sur-reply on July 6, 2011. Clerk's No. 124. Also before the Court are claim construction briefs filed by the parties. Clerk's Nos. 111, 118, 127. On July 8, 2011, the Court held a hearing on EnSoft's motion and on the pending claim construction issues. Clerk's No. 125; *see also* Clerk's No. 97 ¶ 3; Clerk's No. 99. The matters are fully submitted.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. *The Patents–In–Suit*

National Instruments alleges infringement of two of its patents, namely, U.S.

---

1. National Instruments filed an amended response to EnSoft's LR 56(a)(3) statement, with leave of Court, on July 29, 2011. Clerk's No. 129.

Patent No. 5,974,254 (hereinafter "the '254 Patent") and U.S. Patent No. 6,138,270 (hereinafter "the '270 Patent") (collectively "the Patents"). Compl. ¶¶ 6–9; *see also* Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J. (hereinafter "Def's Facts") ¶ 1 (Clerk's No. 93–1); National Instruments' Am. Resp. to Def.'s Statement of Material Facts re Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Fact Resp.") ¶ 1 (Clerk's No. 129). The Patents relate to, generally, detecting differences between—i.e., "differencing"—certain computer programs. *See* '254 Patent; *see also* Def.'s Facts ¶ 2; Pl.'s Fact Resp. ¶ 2. For example, one representative claim discloses:

> A computer-implemented method for detecting differences between first and second graphical programs, wherein the method executes on a computer including a display screen and an input device, wherein the first and second graphical programs comprise graphical code, wherein each of the first and second graphical programs was created in response to user input assembling a plurality of icons and connecting the plurality of icons on a display to create the graphical code, wherein the first graphical program comprises a first plurality of objects and wherein the second graphical program comprises a second plurality of objects, the method comprising:
>
> creating data structures to represent said first and second graphical programs;
>
> matching said first plurality of objects of said first graphical program with said

second plurality of objects of said second graphical program;

determining differences between said first graphical program and said second graphical program in response to said matching; and

displaying an indication of said differences on the display screen.

Def.'s App. in Supp. of its Mot. for Summ. J. (hereinafter ("Def.'s App.")) at 2540003 (showing claim 1 of the '254 Patent, as amended during reexamination) (Clerk's No. 93–2).

### B. *The Reexamination*

National Instruments filed this case on November 13, 2006. *See* Compl. at 1. On August 14, 2007, EnSoft filed a motion to stay the case, citing its "inten[tion] to immediately file a request for reexamination of both" of the Patents. Clerk's No. 45 ¶ 2. On September 20, 2007, Chief U.S. Magistrate Judge Thomas J. Shields granted EnSoft's motion to stay this case pending reexamination of the Patents. Clerk's No. 70. The United States Patent & Trademark Office ("PTO") entered an order granting EnSoft's request for *ex parte* reexamination of the '254 Patent on March 28, 2008 and an order granting EnSoft's request for *ex parte* reexamination of the '270 Patent on April 29, 2008.[2] Def.'s Facts ¶ 5.

The examiner issued a non-final office action regarding the '254 Patent on January 26, 2009 and a non-final office action regarding the '270 Patent on January 30, 2009. *See id.* ¶¶ 6–7. In these office actions, the examiner rejected certain claims in both of the Patents as obvious. Def.'s

---

2. The Court notes that EnSoft failed to provide any support for this assertion in its LR 56(a)(3) statement, and did not include these orders in its appendix. *See* Def.'s Facts ¶ 5; *see also* Clerk's No. 92–3 at 1–2 (appendix table of contents). Because National Instru-

ments has admitted this assertion, the Court will treat it as a stipulation. However, EnSoft is reminded of its duty to comply with the Local Rules and to provide the Court will a complete summary judgment record.

App. at 2540046, 2700046. In support of these rejections, the examiner relied mainly upon an article by Susan Horwitz entitled "Identifying the Semantic and Textual Differences Between Two Versions of a Program" (hereinafter "Horwitz").[3] *See id.* ¶ 7 (citing Def.'s App. at 2540046–47, 2700046–74); *see also* Def.'s App. at 2700103–14 (Horwitz). Horwitz does not specifically mention graphical programs.[4] National Instruments' Statement of Additional Facts Precluding Summ. J. (hereinafter "Pl.'s Facts") ¶ 18 (Clerk's No. 105–2); *see* EnSoft's Resp. to National Instrument[s'] Statement of Additional Material Facts Precluding Summ. J. (hereinafter "Def.'s Fact Resp.") ¶ 18 (Clerk's No. 117). Nonetheless, the examiner noted that "Horwitz identifies semantic changes between two versions of a computer program," *see* Def.'s App. at 2700047, and asserted that Horwitz disclosed a number of limitations in the Patents, such as "the matching/mapping of two computer programs." Def.'s App. at 2540048.

National Instruments responded to the office actions regarding the '254 Patent and the '270 Patent on March 25, 2009 and March 30, 2009, respectively. *See* Def.'s Facts ¶ 13. In these responses, National Instruments argued that the prior art, and specifically Horwitz, did not "teach[ ] or suggest a number of limitations of [the]

claims." *E.g.*, Def.'s App. at 2540038. For example, National Instruments argued that:

> The cited references do not teach or suggest the concept of "graphical programs" or graphical programs comprising "graphical code". As noted above, both the Laski and Horwitz references relate to determining differences between *textual code*. Further, both Laski and Horwitz create "flow graphs" based on small portions of textual code. However, *these flow graphs are not "programs"*, i.e., these flow graphs are not themselves executable programs. Rather, these flow graphs are simply representations of the text based code. The term "graphical code" refers to computer source code that is graphical in nature. Graphical code is executable, i.e., is capable of being compiled by a computer (or otherwise converted to machine language instructions) for execution. The cited references do not teach or suggest any type of graphical source code. The simple flow graphs created in Laski and Horwitz are NOT source code—these flow graphs are not executable, e.g., they cannot be compiled for execution by a computer.
>
> The cited references further do not teach or suggest **determining differences between said first graphical pro-**

---

3. The parties disagree about what, exactly, Horwitz teaches. *Compare* Def.'s Facts ¶¶ 8–10, *with* Pl.'s Fact Resp. ¶¶ 8–10.

4. EnSoft purports to deny this assertion; however, EnSoft does not properly support its denial. *Compare* Def.'s Fact Resp. ¶ 18 (citing no authority and challenging one—but not all—of National Instruments' citations), *with* Fed.R.Civ.P. 56(c)(1) ("A party asserting that a fact … is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record …; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."). Additionally, EnSoft has failed to provide any support for its counter-assertion that "[i]t is obvious to a person of ordinary knowledge in the art that Horwitz' method applies to textual and graphical programs since they share all relevant characteristics." *See* Def.'s Fact Resp. ¶ 18. Indeed, in this statement, EnSoft tacitly concedes that Horwitz does not specifically, or at least expressly, discuss graphical programs. *See id.* Accordingly, EnSoft has failed to demonstrate that there is any genuine dispute as to this fact.

**gram and said second graphical program, wherein the first and second graphical programs comprise graphical code.** As described above, Laski and Horwitz generally discloses conversion of simple, sequential textual programs to flow graphs (which are not graphical programs) and then comparison of those flow graphs to determine differences between the textual programs. As noted above, the flow graphs disclosed in Laski and Horwitz are NOT graphical programs. Thus the cited references do not determine differences between two graphical programs.

*Id.* at 2540038–39 (emphasis and nonstandard punctuation in original); *id.* at 2700039–40 (same).

The examiner issued another non-final office action regarding the '254 Patent on June 26, 2009 and another non-final office action regarding the '270 Patent on June 30, 2009. *See* Def.'s Facts ¶ 17. Again, the Examiner cited Horwitz, among other references, in support of its rejections.[5] *See, e.g.,* Def.'s App. at 2540030. Regarding the "graphical program" limitation, the examiner stated:

Given the broadest reasonable interpretation, the limitation "graphical program" or graphical programs comprising "graphical code" read on the flow graphs of Laski and Horwitz. As described in the '254 patent, graphical programs comprise graphical representations of programming constructs and typically comprise functional blocks graphically represented as icons. Therefore, the flow graphs are representations of programming constructs and the function blocks icons correspond to vertices of the graph representation used by Laski and Horwitz. Regarding the argument

that "flow graphs" are not executable programs, the limitation 'executable' is not claimed. Even though Laski and Horwitz are text based programs the flow graphs are graphical representations of those programs.

*Id.* at 2540030–31 (nonstandard punctuation in original, internal citations omitted).

National Instruments responded to the office actions regarding the '254 Patent and the '270 Patent on August 20, 2009 and September 9, 2009, respectively. *See* Def.'s Facts ¶ 19 (citing Def.'s App. at 2540026–27, 2700027). In these responses, National Instruments "disagree[d] with the assertion that [Horwitz] can be read on the concept of graphical programs, as presently claimed." Pl.'s Fact Resp. ¶ 19 (citing Def.'s App. at 2540026, 2700026). In particular, National Instruments argued that:

[A]ddressing the assertion regarding the "unclaimed limitation" 'executable', Patent Owner submits that one of skill in the art understands that graphical programs are inherently executable—a computer program, or a program comprising "code", by definition, must be executable. Thus, Patent Owner submits that the flow graphs of Laski and Horwitz are not graphical programs or (graphical) code that is executable, but instead are data structures solely used for determining textual differences between textual programs.

Def.'s App. at 2540026–27 (nonstandard punctuation in original).

On May 25, 2010, the examiner issued a "Notice of Intent to Issue Reexamination Certificate" for each of the Patents. *See* Def.'s Facts ¶ 23 (citing Def.'s App. at 2540021–25, 2700021–25). In the "State-

---

**5.** Because EnSoft has failed to provide the Court with the full reexamination history, *see supra* note 3, the details regarding the precise nature of the rejections is not before the Court.

ment of Reasons of Patentability and/or Confirmation," the examiner made the following comments regarding the references discussed above:

The Laski reference

The Laski reference discloses identifying modifications in software programs in an automatic way. Laski discloses the use of flow graphs of the original and modified programs and then reducing the flow graphs using an algorithm. Laski discloses that the flow graphs are representations of text based programs such as P1, P2, and P3. Laski further discloses determining the differences between the flow graphs.

The Horwitz reference

The Horwitz reference discloses text-based file comparators for comparing two versions of a program, determining which program components represent changes, and classifying each changed component as representing either a semantic or a textual change. Horwitz discloses that a partitioning algorithm uses a graph representation of programs called a Program Representation Graph (PRG). The PRGs are defined only for programs in a limited language with scalar variables, assignment statements, conditional statements, while loops, and output statements.

Def.'s App. at 2540021–22 (internal citations and italics omitted); *id.* at 2700021–22 (same). The examiner also stated:

In the Non–Final Office Action, which was mailed on June 20, 2009, the Examiner stated that the limitation graphical program or graphical programs comprising graphical code reads on the flow graphs of Laski and Horwitz since the flow graphs are representations of programming constructs and the vertices of

the graph correspond to the function block icons. . . . Patent owner contends that the graphs described in Laski and Horwitz are not "graphical" since they are not programs, i.e., they are not executable, and are not intended for display. Therefore, Patent Owner concludes that these flow graphs cannot be "graphical programs". *To further clarify this issue Patent Owner has amended the majority of claims to recite "created in response to user input assembling a plurality of icons and connecting the plurality of icons on a display to create the graphical code ".*

*Id.* at 2540023 (nonstandard punctuation and italics in original); *id.* at 2700021–22 (same).

On September 21, 2010, the PTO issued Ex Parte Reexamination Certificates for each of the Patents. *See* Ex Parte Reexamination Certificate No. U.S. 5,974,254 C1 (hereinafter "the '254 Reexam Certificate"); Ex Parte Reexamination Certificate No. U.S. 6,138,270 C1 (hereinafter "the '270 Reexam Certificate"). On November 12, 2010, Judge Shields lifted the stay. Clerk's No. 80. EnSoft now seeks summary judgment of noninfringement. *See* Mot. ¶ 3.

### C. *The Accused Products*

In this case, National Instruments alleges that EnSoft's SimDiff and SimMerge computer software products infringe the Patents. Def.'s Facts ¶ 1; Pl.'s Fact Resp. ¶ 1. For the purposes of this motion, the parties agree that any arguments about SimDiff apply equally to SimMerge. Hr'g Tr. at 36.[6] Therefore, the Court will focus its discussion on SimDiff.

---

**6.** Citations to "Hr'g Tr." refer to the rough transcript of the July 8, 2011 hearing that was provided to the Court by the court reporter.

The following facts about SimDiff are undisputed.[7] SimDiff is used to find differences in "Simulink models."[8] National Instruments' Statement of Additional Material Facts Precluding Summ. J. (hereinafter "Pl.'s Facts") ¶ 10 (Clerk's No. 102–3). "Simulink models" are created by "a graphical programming tool" called Simulink. *See id.* ¶¶ 1–2. Simulink models are executable.[9] *Id.* ¶ 5 (citing Pl.'s App. at 232 (Kothari Dep. Tr. at 90:7–10), 249 (Simulink Get Started Guide at 2–9), 257 (Simulink User Guide at 11–3), 259 (Simulink User Guide at 11–5)). "Simulink saves Simulink models as files with the file name extension of '.mdl' (herein referred to as 'MDL files')."[10] *Id.* ¶ 6 (citing Pl.'s

7. EnSoft purports to deny a number of factual assertions made by National Instruments. *See* Def.'s Fact Resp. ¶¶ 3–18. However, EnSoft provides no support for its denials of most of these assertions. *See id.* ¶¶ 7–15, 17 (providing neither record citations nor any challenge to National Instruments' cited evidence); *see also* Fed.R.Civ.P. 56(c)(1). Because EnSoft has not adequately supported these denials, the Court treats these facts as undisputed for the purposes of the instant motion.

8. EnSoft argues that this fact and other facts about Simulink are not material "to the issues presented by the Motion for Summary Judgment" because they are "irrelevant for the purpose of analyzing the accused product, SimDiff." *E.g.,* Def.'s Fact Resp. ¶ 3. According to EnSoft,

> [T]he issue of what Simulink *can* create is irrelevant in the present case where the undisputed evidence has established that the types of files compared by SimDiff, namely; MDL Text files, are "data structures" which merely represent graphical programs, which do not have the required characteristics of a "program" and which cannot "execute" in the SimDiff environment. (*See* Heimdahl Dep. 35:1–35:5, 38:3–39:10, 43:21–44:6, 54:7, 58:20–58:24, 59:8–59:18, 78:5–78:14, 96:7–96:15, 100:24–101:2, 102:25–103:10) (Def.'s Supp. App. at 019–021, 024–025, 034–036).

*Id.; see also id.* ¶¶ 4–6, 8–15, 17 (making the same assertion, supported by the same evidence). The Court does not agree that "the undisputed evidence has established" all of these propositions.

Although EnSoft's citations support the proposition that MDL text files "cannot 'execute' in the SimDiff environment," they do *not* support EnSoft's other two propositions. Specifically, these citations do not relate to— let alone establish—that MDL text files "are 'data structures' which merely represent graphical programs" or that MDL text files

"do not have the required characteristics of a 'program.' " *See, e.g., id.* ¶ 3. Moreover, the Court is not convinced that information about Simulink is as irrelevant as EnSoft insists. Even if information about Simulink is not strictly necessary to decide the instant motion, the Court finds that it provides a helpful background for understanding the technology at issue.

9. EnSoft also purports to deny this assertion but provides no citations to the record in support of its denial. *See* Def.'s Fact Resp. ¶ 5. EnSoft also does not challenge most of National Instruments' citations. *See id.; see also* Fed.R.Civ.P. 56(c)(1). EnSoft does assert, however, that "[t]he cite to the Kothari deposition does not support this allegation." Def.'s Fact Resp. ¶ 5. According to EnSoft, "Dr. Kothari does not state in his deposition that 'Simulink models are executable' but states that Simulink models 'can' be executable." *Id.* Although EnSoft is correct that Dr. Kothari did not directly state that "Simulink models are executable," the Court cannot agree that, in his cited deposition testimony, Dr. Kothari only said that "Simulink models 'can' be executable." *See id.; see also* App. 232 (Kothari Dep. Tr. 90:7–10) (Clerk's 102–9 at 35) ("Q. To be clear, the user can cause the graphical program that corresponds to the model represented by their MDL file to execute. A. Yeah, the user can do that."). Again, the Court concludes that EnSoft has failed to adequately rebut this factual assertion; therefore, the Court will treat this fact as undisputed for the purposes of the instant motion.

10. EnSoft purports to deny this fact; however, EnSoft does not provide citations to any rebuttal evidence. *See* Def.'s Fact Resp. ¶ 6. EnSoft does assert that "[t]he cite to the Kothari deposition does not support this allegation" because "Dr. Kothari does not state in his deposition that 'Simulink models are

App. at 205 (Kothari Dep. Tr. 38:7–11), 244 (Simulink Get Started Guide at 2–4, 2–5)). MDL files are executable graphical programs. *Id.* ¶¶ 8–9.

"SimDiff takes two Simulink models, in the form of MDL files, as inputs." *Id.* ¶ 11 (citing Pl.'s App. at 279–80 (EnSoft Online Demonstration of SimDiff, at 2, 5–6), 117–18 (Heimdahl Decl. ¶¶ 49–50)). Then, "SimDiff creates graph data structures based on the MDL files to represent the Simulink models." *Id.* ¶ 12 (citing Pl.'s App. at 118 (Heimdahl Decl. ¶¶ 51–52) and Br. of Authorities in Supp. of Def.'s Mot. for Summ. J. (hereinafter "Def.'s Br.") at 7, Fig. 2 (Clerk's No. 93–4)). "SimDiff matches objects in the two Simulink models by matching objects in the graph data structures that represent the Simulink models." *Id.* ¶ 13 (citing Pl.'s App. at 119–20 (Heimdahl Decl. ¶¶ 53–56)). "SimDiff then determines differences between objects in the two Simulink models by determining differences between the objects in the graph data structures that represent the Simulink models." *Id.* ¶ 14 (citing Pl.'s App. at 120–21 (Heimdahl Decl. ¶¶ 58–60)). "One way SimDiff displays the differences between the two Simulink models is by presenting on a display screen a textual description of the differences." *Id.* ¶ 15 (citing Pl.'s App. at 121–22 (Heimdahl Decl. ¶ 62)).

## II. LEGAL STANDARDS

### A. General Standard for Summary Judgment

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[11] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[12] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary

---

saved as MDL files.' " *Id.* It is true that the cited portion of Dr. Kothari's deposition does not squarely support this proposition; however, EnSoft does not assert that the other cited evidence (i.e., the Simulink Get Started Guide) fails to support National Instruments' assertion. *See id.* Therefore, EnSoft has failed to adequately rebut this assertion. *See* Fed.R.Civ.P. 56(c).

**11.** Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**12.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir.1992); *see also* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the job of a court is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)). It is the responsibility of the parties to provide the evidence necessary for this assessment. *Id.* at 921.

### B. *Summary Judgment of Non–Infringement*

In a patent case, "[e]valuation of summary judgment of non-infringement requires two steps—proper claim construction and comparison of those claims to the accused product." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.,* 595 F.3d 1340, 1350 (Fed.Cir.2010) (citing *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1288 (Fed.Cir. 2009)). Claim construction "involves ascertaining the scope and meaning of the claims at issue." *Streamfeeder, LLC v. Sure–Feed Sys. Inc.,* 175 F.3d 974, 981 (Fed.Cir.1999).

In claim construction the words of the claims are construed independent of the accused product ... [and] it is efficient to focus on the construction of only the disputed elements or limitations of the claims ... [as] a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims.

*Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1580 (Fed.Cir. 1991) (internal quotation marks omitted). Claim construction is a question of law to be resolved by the Court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

In attempting to construe a patent claim, the Court must first examine the language of the claim itself, the patent specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1216 (Fed.Cir.1995). The words of a claim should be given "their ordinary and customary meaning." *Lexion Med., LLC v. Northgate Techs., Inc.,* 641 F.3d 1352, 1356 (Fed.Cir.2011) (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc)). However, "[t]he customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention." *Id.* (citing *Phillips,* 415 F.3d at 1314; and *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088 (Fed.Cir. 2003)).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics,* 90 F.3d at 1583 (citing, *inter alia, Pall Corp.,* 66 F.3d at 1216). Therefore, while a court may rely on expert testimony and other

extrinsic evidence to help it understand the underlying technology, extrinsic evidence about the proper construction of a claim term "may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur." *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308–09 (Fed.Cir.1999) (reiterating that courts should not "rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from thoughtful examination of the claims, the written descriptions, and the prosecution history—the intrinsic evidence," but noting that courts may consider extrinsic evidence to ensure that any interpretation of claim language is not in contravention to "clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field") (citing *Vitronics,* 90 F.3d at 1585).

■ After construing the claims, the Court must "compare[ ] the properly construed claims to the accused device." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.,* 324 F.3d 1308, 1318 (Fed. Cir.2003) (citing *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir. 1998) (en banc)). "This second step in the infringement analysis presents an issue of fact." *Id.* (citing *Cybor Corp.,* 138 F.3d at 1454). "A court may grant summary judgment of noninfringement if, after viewing the alleged facts in the light most favorable to the patentee and drawing all reasonable inferences in the patentee's favor, there is no genuine issue as to whether the patent claims encompass the accused device." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC,* 776 F.Supp.2d 606, 609 (N.D.Ill.2011) (citing *Novartis Corp. v. Ben Venue Labs.,* 271 F.3d 1043, 1046 (Fed.Cir.2001)).

## III. ANALYSIS

### A. *Claim Construction*

The parties dispute how the five claim terms should be construed. *See* Clerk's No. 100 (listing eight disputed terms); *see also* Def.'s Opening Claim Constr. Br. (hereinafter "Def.'s Markman Br.") at 16–18 (Clerk's No. 118) (asserting that, "[u]pon further consideration" three of the previously disputed claims "do[ ] not need to be construed at this time"). The Court will consider each of the disputed terms in turn.

1. "Graphical program."

a. *EnSoft's proposed construction.*

■ EnSoft argues that, based upon National Instruments' statements to the examiner during reexamination of the Patents, the term "graphical program" should be construed to mean "executable graphical computer program comprising graphical code or objects." Def.'s Markman Br. at 5. National Instruments argues that the construction of "graphical program" should not include the two limitations proposed by EnSoft—namely, "executable" and "comprising graphical code or objects." The Court will address these proposed limitations in turn.

i. *"Executable."*

EnSoft argues that its "proposed construction of the claim term graphical program as requiring the property of executability must stand." Def.'s Markman Br. at 7. This argument is based on two assertions—namely, according to EnSoft, during reexamination, National Instruments told the examiner: (1) "that graphical programs are executable" and (2) that "the prior art does not operate on executable graphical programs." *See id.* at 6 (referring to Def.'s App. at 2540038–39, 2700039–40) (emphasis added). The Court

will address each of these assertions in turn.

National Instruments does not seriously dispute EnSoft's first assertion—i.e., that graphical programs must be "executable." *See* Hr'g Tr. at 24 (Mr. Scherkenbach: "We agree graphical programs are executable. No problem. And if we want— somebody wants to tell the jury that, they can tell the jury that because it's true."). However, National Instruments argues that it is neither necessary nor proper to include that term in the construction of the term "graphical program." *See* Hr'g Tr. at 24 (Mr. Scherkenbach: "One of our objections is [that importing the term "executable" into the construction is] really just going to confuse the jury because it's not germane.... It's not necessary to do this as—to read it into the claim as part of the claim construction process, it's not helpful...."). The Court agrees. If, as the parties agree, a "graphical" program must be "executable," it is not necessary to include that descriptor in the term's construction.[13]

EnSoft's second assertion—i.e., that National Instruments told the examiner that "the prior art does not operate on executable graphical programs"—is technically correct. *See* Def.'s Markman Br. at 6. During prosecution, National Instruments distinguished Horwitz by pointing out that Horwitz did not disclose an important element of the claimed invention—namely, a graphical program. *E.g.*, Def.'s App. at 2540039–40. In response to the examiner's assertion that the graph representations in Horwitz satisfied the "graphical program" limitation in the claimed invention, National Instruments argued that the graph representations in Horwitz did not qualify as graphical programs because, *inter alia*, they were not executable. *See id.*

Thus, it is fair to say that National Instruments distinguished Horwitz based upon its lack of an "executable graphical program." Def.'s Markman Br. at 6. However, this assertion does not support EnSoft's real argument.

EnSoft's real argument is that National Instruments is barred by the doctrine of prosecution history disclaimer from claiming literal infringement of any product that "difference non-executable graph representations." Br. of Authorities in Supp. of Def.'s Mot. for Summ. J. (hereinafter "Def.'s SJ Br.") at 20 (Clerk's No. 93–4). The Court does not agree.

■■■ "The doctrine of prosecution disclaimer ... preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir.2003). As the Federal Circuit has explained:

> Claim terms are entitled to a "heavy presumption" that they carry their ordinary and customary meaning to those skilled in the art in light of the claim term's usage in the patent specification. However, when a patent applicant surrendered claim scope during prosecution before the PTO, the ordinary and customary meaning of a claim term may not apply.

*Elbex Video, Ltd. v. Sensormatic Elec. Corp.*, 508 F.3d 1366, 1371 (Fed.Cir.2007) (internal citations omitted). Therefore, "[t]he court examines the prosecution history, when pointed out and placed in evidence, to ascertain if a proffered claim construction has been disclaimed." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed.Cir.2005); *see also Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed.Cir.2009) (citing *Cybor Corp.*,

---

**13.** As the Court understands it, EnSoft's argument is akin to arguing that a claim using the term "water" must be construed to include a limitation that the water be "wet."

138 F.3d at 1456) ("Whether prosecution history disclaimer applies is a legal question...."). If, during prosecution, an applicant distinguishes "the claimed invention over the prior art, an applicant is indicating what the claims do not cover" and is "by implication surrendering such protection." *See Ecolab*, 569 F.3d at 1342 (quoting *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed.Cir.1997)).

However, "[a]n argument made to an examiner constitutes a disclaimer only if it is 'clear and unmistakable.'" *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed.Cir.2010) (quoting *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir.2006)). "There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed.Cir.2005). In other words, "[a]n 'ambiguous disavowal' will not suffice." *Schindler Elevator Corp.*, 593 F.3d at 1285 (quoting *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed.Cir.2008)); *see also Elbex Video*, 508 F.3d at 1371 ("This doctrine does not apply 'where the alleged disavowal is ambiguous;' the disavowal must 'be both clear and unmistakable' to one of ordinary skill in the art." (quoting *Omega Eng'g*, 334 F.3d at 1326)).

According to EnSoft, "there can be no doubt that when [National Instruments] asserted that 'graphical programs are inherently executable,' [National Instruments] intended to distinguish the claimed invention from products, such as the prior art and EnSoft's SimDiff, that use nonexecutable graph representations." Def.'s SJ Br. at 19–20 (quoting Def.'s App. at 2540026–27 (Def.'s alteration of quotation omitted)). The Court does not agree. During reexamination, National Instruments did not disclaim the use of "nonexecutable graph representations." Instead, it merely argued that Horwitz did not disclose the comparison of any *graphical*—as opposed to textual—programs.[14] *E.g.*, Def.'s App. at 2540026–27; *see also* Hr'g Tr. at 68 (Mr. Scherkenbach: "NI did not disclaim using a representation of a program. The problem was that there's nothing in Horwitz at all that's a graphical program, period.... The real distinctions that ... overcame Horwitz were that it operates exclusively on textual programs. That was the whole battle. [Horwitz is] a textual differencing tool."). Therefore, EnSoft's argument is not supported by a fair reading of the prosecution history.[15] Accordingly, EnSoft has failed to show that National Instruments clearly and unmistakably disclaimed the use of "nonexecutable graph representations."[16] *Com-*

---

14. Notably, contrary to EnSoft's suggestion, National Instruments also did not clearly and unmistakably disclaim a program that compared text *files*, as opposed to textual programs. *Schindler Elevator*, 593 F.3d at 1285.

15. The Court notes that, although EnSoft acknowledges that "[i]n determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole," Def.'s SJ Br. at 19 (quoting *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1252 (Fed.Cir. 2000)), EnSoft has not provided the Court

with the full reexamination history. Although—as the Court noted at the hearing— the reexamination history is a matter of public record, that fact does not relieve EnSoft of its duty to provide the Court with a full and complete summary judgment record.

16. It is true, as EnSoft notes, that "[a] patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed.Cir.2003)

pare *Schindler Elevator,* 593 F.3d at 1285, *with* Def.'s SJ Br. at 20.

ii. *"Comprising graphical code or objects."*

EnSoft also asserts that the construction of the term "graphical program" should include "comprising graphical code or objects." Def.'s Markman Br. at 5. According to EnSoft, the Patents "repeatedly state that graphical programs are comprised of graphical code or objects." *See id.* at 8 (citing Def.'s App. at 2540003–06). National Instruments argues that this construction "runs contrary to long-standing Federal Circuit precedent stressing that claims should not be defined by specific preferred embodiments in the specification." Pl. National Instruments Corp.'s Reply Br. on Claim Constr. (hereinafter "Pl.'s Markman Reply") at 3 (Clerk's No. 123–1) (citing *Phillips,* 415 F.3d at 1323). The Court agrees. EnSoft has failed to demonstrate that "graphical program" must be construed to include this limitation.

b. *National Instruments' proposed construction.*

National Instruments argues that the term "graphical program" should be construed as "a computer program created using graphical code." Pl. National Instruments Corp.'s Opening Br. on Claim Constr. (hereinafter "Pl.'s Markman Br.") at 12 (Clerk's No. 111). The Court agrees that this construction is supported by the intrinsic evidence.[17] *E.g.,* Def.'s App. at 2540003 (showing claim 1 of the '254 Pat-

ent, which states, in relevant part, that "each of the ... graphical programs was created in response to user input assembling ... and connecting [a] plurality of icons on a display to create the graphical code").

For the foregoing reasons, the Court construes "graphical program" to mean "a computer program created using graphical code."

2. *"Graphical data flow program."*

 EnSoft argues that the term "graphical data flow program" should be construed as an "executable data flow program." Def.'s Markman Br. at 13. Specifically, EnSoft argues that "graphical data flow programs are still first and foremost 'graphical programs.'" *Id.* Thus, according to EnSoft, they "must be executable" for the same reasons that "graphical programs" must be "executable." *See id.* The Court does not agree. Even if the Court were to accept EnSoft's argument that "graphical data flow programs are still first and foremost 'graphical programs,'" the Court has already rejected EnSoft's arguments regarding the construction of "graphical program." *See supra* Section III(A)(1)(a)(i). And EnSoft has offered no more persuasive reason why an express "executable" limitation should be added to the construction of "graphical data flow program." *See* Def.'s Markman Br. at 13–14.

National Instruments argues that the claim term "graphical data flow program" should be construed as "a computer data flow program created using graphical

(cited in Def.'s Markman Br. at 7). However, EnSoft does not explain how this proposition of law might have any applicability to this claim construction dispute. National Instruments did not "state during prosecution that the claims do not cover" any of EnSoft's devices. *See id.* Therefore, National Instru-

ments has not "sue[d] a party who makes *that same device* for infringement." *See id.* (emphasis added).

17. The Court also notes that, prior to reexamination, EnSoft agreed to this construction. *See* Clerk's No. 50 at 3.

code." Pl.'s Markman Br. at 14. The Court agrees that this construction is appropriate in light of the intrinsic and extrinsic evidence.

For the foregoing reasons, the Court construes "graphical data flow program" to mean "a computer data flow program created using graphical code."

### 3. "Graphical code."

#### a. *EnSoft's proposed construction.*

 EnSoft argues that "graphical code" should be construed as "executable non-textual computer code," based on the reexamination prosecution history. Def.'s Markman Br. at 9. The parties dispute whether graphical code must be non-textual and whether graphical code must be executable. Pl.'s Markman Reply at 4. The Court will address each of these issues in turn.

#### i. *Non-textual.*

EnSoft argues that "graphical code" must be construed to include a limitation that the code is "non-textual." *See* Def.'s Markman Br. at 9, 11–12. In support of this argument, EnSoft quotes from the following passage from National Instruments' summary judgment brief:

> National Instruments invented a fundamentally different way for people to program computers—graphically, by manipulating and organizing pictures ("icons") on a display screen to create a graphical program. National Instruments introduced its intuitive graphical programming to the public with its groundbreaking LabVIEW software in 1986. In LabVIEW, the user's manipulation, organization, and connection of icons on a screen produces machine language that accomplishes the desired process depicted in the graphical program. '254 Patent at 3:13–16 ( [Def.'s] App. at 2540082).

In the case of LabVIEW, the diagram the programmer creates by manipulating, connecting, and organizing icons on a page—and not text—constitutes the "source code" for the program being created; LabVIEW can translate that source·code into object code that will run on any computer where the diagram itself is present, analogous to the way that a traditional compiler translates textual source code into object code which is executable on a computer.

Mem. of Points and Authorities in Supp. of National Instruments' Resistance to EnSoft's Mot. for Summ. J. (hereinafter "Pl.'s SJ Br.") at 5 (Clerk's No. 105) (cited in Def.'s Markman Br. at 12).

In response, National Instruments argues that "the passages EnSoft cites do not constitute a clear disavowal of claim scope." Pl.'s Markman Reply at 5. The Court agrees. Moreover, EnSoft's proposed construction is more likely to obfuscate than to clarify the relevant issues. It is true that National Instruments distinguished its graphical code from the "textual code" used in the prior art; however, that fact does not justify the wholesale—and potentially misleading—bootstrapping of a "non-textual" limitation into the term "graphical code." Therefore, EnSoft has failed to demonstrate that the construction of the term "graphical code" should include a "non-textual limitation."

#### ii. *Executable.*

EnSoft argues that "graphical code" must be construed to include "executable" as a limitation. *See id.* at 9. In support of this argument, EnSoft points to portions of the prosecution history where National Instruments stated:

> The cited references do not teach or suggest the concept of **"graphical programs"** or graphical programs comprising **"graphical code"**. As noted above,

**1070**

both the Laski and Horwitz references relate to determining differences between *textual code*. Further, both Laski and Horwitz create "flow graphs" based on small portions of textual code. However, *these flow graphs are not "programs"*, i.e., these flow graphs are not themselves executable programs. Rather, these flow graphs are simply representations of the text based code. The term "graphical code" refers to computer source code that is graphical in nature. Graphical code is executable, i.e., is capable of being compiled by a computer (or otherwise converted to machine language instructions) for execution. The cited references do not teach or suggest any type of graphical source code. The simple flow graphs created in Laski and Horwitz are NOT source code—these flow graphs are not executable, e.g., they cannot be compiled for execution by a computer.

Def.'s App. at 2540038 (nonstandard punctuation and emphasis in original). National Instruments disputes this construction for largely the same reasons it rejected the addition of an "executable" limitation in the constructions of the previously-discussed terms. *See* Pl.'s Markman Reply at 6.

Although National Instruments told the examiner that "[g]raphical code is executable," this statement does not constitute a "clear and unmistakable" disclaimer of any subject matter—or, at least, of the subject matter EnSoft claims that National Instru-

ments has disclaimed.[18] *See Schindler Elevator*, 593 F.3d at 1285. Therefore, EnSoft has failed to demonstrate that "graphical program" should be construed to contain an "executable" limitation.

b. *National Instruments' proposed construction.*

National Instruments argues that the Court does not need to construe the term "graphical code" because "the meaning of this term is clear to a person of ordinary skill in the art." Pl.'s Markman Br. at 14; *id.* at 15 (citing *Phillips*, 415 F.3d at 1312–13). However, National Instruments does not provide any support for this argument. *See id.* at 14–15.

National Instruments also argues that "if the Court decides the term requires construction," then "graphical code" should be construed to mean "a graphical representation of a computer instruction." Pl.'s Markman Br. at 14. According to National Instruments, this construction is consistent with the specification and "consistent with how a person of ordinary skill understands the term 'graphical code.'" *See id.* at 15 (citing Def.'s App. at 2540082 ('254 Patent at col. 4, ll. 11–19); *id.* at 2540084 ('254 Patent at col. 8, ll. 57–59); and Pl.'s App. at 103 (Heimdahl Decl. ¶ 13)). EnSoft argues that "[t]his assertion is patently false on at least two counts." Def.'s Markman Br. at 10.

First, EnSoft argues that, during reexamination, National Instruments "made

**18.** The Court notes that the precise contours of National Instruments' infringement theory—or theories—are not currently before the Court. Therefore, it is not clear whether National Instruments will argue that some non-executable element of the accused devices satisfies the "graphical code" limitation. If National Instruments does so, the disclaimer/estoppel issue may require further consideration. But in any case, the Court rejects EnSoft's contention that the code (or the pro-

gram itself) must be executing "during the practice of the patent" in order to infringe. *See* Clerk's No. 117–2 at 12–13. EnSoft's arguments on this issue improperly conflate the concept of executability with actual execution and are not supported by the record. *See id.;* Def.'s App. at 2540038 (defining "executable" as *"capable* of being compiled by a computer (or otherwise converted to machine language instructions) for execution" (emphasis added)); *see also* Clerk's No. 124 at 8–9.

clear that graphical code, unlike the prior art representations of code, was not a simple representation of computer instructions, but it actually is a computer instruction (i.e., executable)." *Id.* In support of this argument, EnSoft points to the portion of the prosecution history where National Instruments stated:

> [B]oth Laski and Horwitz create "flow graphs" based on small portions of textual code. However, these flow graphs are not "programs", i.e., these flow graphs are not themselves executable programs. Rather, these flow graphs are simply representations of the text based code. The term "graphical code" refers to computer source code that is graphical in nature. Graphical code is executable, i.e., is capable of being compiled by a computer (or otherwise converted to machine language instructions) for execution. The cited references do not teach or suggest any type of graphical source code.

Def.'s App. at 2540038 (quoted in part in Def.'s Markman Br. at 10) (nonstandard punctuation in original). EnSoft places great weight upon the use of the term "representations" in this passage; however, this passage cannot fairly be read to support EnSoft's assertion that graphical code is not a simple representation of computer instructions, but it actually *is* a computer instruction." Def.'s Markman Br. at 10. And it certainly does not amount to a "clear and unmistakable" disclaimer of code that merely represents a computer instruction. *See Schindler Elevator*, 593 F.3d at 1285.

Moreover, even if the cited passage did support EnSoft's argument, the prosecution history must be read in its entirety, not in isolated snippets. And in the prosecution history, National Instruments also describes graphical code as "a two-dimen-

sional representation of source code." Def.'s App. at 2540040. This type of clear statement, especially when read in light of the intrinsic evidence cited by National Instruments, supports National Instruments' proposed construction.

For the foregoing reasons, the Court construes "graphical code" to mean "a graphical representation of a computer instruction."

### 4. "Object."

National Instruments argues that the term "object" need not be construed because "[t]he term 'object' has a well-known meaning in the art of graphical programming, and it is used in the patents in its ordinary sense—i.e., to refer to an object displayed on the graphical diagram created by the programmer." Pl.'s Markman Br. at 17. However, National Instruments does not provide any support for this argument. *See id.*

National Instruments also argues that "[i]f the Court decides to construe the term, ... it should be construed as 'a component of a graphical program,'" based on the language in the Patents themselves. *Id.* (citing, *inter alia*, Def.'s App. at 2540068 ('254 Patent Abstract)). EnSoft does not dispute that "objects are parts/components of graphical programs." Def.'s Markman Br. at 14. However, EnSoft argues that the claim term "object" should be construed as *"executable* parts of a graphical program." Def.'s Markman Br. at 14.

In support of its construction, EnSoft states that "[t]he only relevant section of the specification of the [Patents] ... states that the term refers to objects used in object oriented programming ('OOP')." *See id.* (citing Def.'s App. at 2540084 [19]

___
19. EnSoft actually cites page 2540006, which

does not correspond with the specified por-

('254 Patent at col. 8, ll. 11–18); *id.* at 2700091 ('270 Patent at col. 8, ll. 35–40)). EnSoft then asserts—without any citation or support—that:

> OOP is a well-established, long standing, well understood computer programming standard used by many programming languages, where objects are used as programming constructs to model the state and behavior of real world objects. For present purposes, the only thing that matters is that as a fundamental component of computer programs objects are by definition executable.
>
> Furthermore, as is crystal clear at this point, graphical programs are executable therefore graphical programs must be built from executable components. There is simply no other way to create an executable program.

*Id.* at 15. Even if EnSoft had provided some support for these assertions, the cited portions of the Patents say only that "[a]n object may be defined ... according to the notion of objects in the art of object oriented programming." Def.'s App. at 2540084 ('254 Patent at col. 8, ll. 13–16); *id.* at 2700091 ('270 Patent at col. 8, ll. 37–40) (same). They do not say that it must be so defined. Additionally, as National Instruments points out, although "the term 'executable' is used a handful of times in the intrinsic record, it is not used to refer to objects." Pl.'s Markman Br. at 18. According to National Instruments, "none of the more than 250 other instances of the term 'object' in the [Patents] suggest that objects themselves must be executable." *Id.* Therefore, EnSoft has failed to demonstrate that an "object," as that

term is used in the Patents, must be executable.

For the foregoing reasons, the Court construes "object" to mean "a component of a graphical program."

5. "Score value"

■ National Instruments argues that the claim term "score value" should be construed as "a value that represents a degree of similarity." Pl.'s Markman Br. at 22. According to National Instruments:

> Claim 21 [of the '254 Patent]—where the term first appears—directly supports National Instruments' construction, reciting that "wherein said score value indicates a degree of matching between said object elements comprising said object pair." [Def.'s] App. at 2540003 (2:4–6). This construction is further supported by the specification, which explains that score values indicate a degree of similarity between objects in two graphical programs. [Def.'s] App. at 2540082 (4:63–67) ("Preferably, the matching is performed according to a matching heuristic which calculates scores indicating a degree of similarity between an object in the first graphical program and an object in the second graphical program according to one or more criteria.").

*Id.*

EnSoft, by contrast, argues that "score value" should be construed as "a numerical value indicating the quality of matching of executable objects of two graphical programs." Def.'s Markman Br. at 15. In support of this construction, EnSoft points to various portions from the specifications of the Patents.[20] *Id.* at 15–16. However,

---

tion of the '254 Patent, *see* Def.'s Markman Br. at 14; the Court assumes EnSoft meant to cite page 2540084.

**20.** EnSoft also asserts that "[t]he concept of a 'score value' is clearly a mathematical con-

struct, and therefore a calculated numeric value. A score is clearly a numerical value, and in this case one that is numeric indicia of value." Def.'s Markman Br. at 15. However,

the cited portions of the Patents do not clearly contradict National Instruments' proposed construction, which is well-supported by the claim language and the specification.[21] These portions refer to concepts such as "the highest score" or a "tie"—concepts that could apply equally to numerical scores or non-numerical scores, such as the familiar A–F scale used in many educational institutions. *See id.* In short, EnSoft has not pointed to any evidence, intrinsic or extrinsic, which indicates that a "score value" must be "numerical."

For the foregoing reasons, the Court construes "score value" to mean "a value that represents a degree of similarity."

### B. *EnSoft's Motion for Summary Judgment*

■ EnSoft's motion for summary judgment is based entirely on its assertion that "[d]uring the reexaminations, to overcome the prior art that the USPTO relied on in rejecting the patents,.... [National Instruments] argued that the prior [art] is about differencing non-executable graph representations of programs and their patent cover differencing executable graphical programs." Def.'s SJ Br. at 2; *see also* EnSoft's Reply to Pl.'s Resistance to Mot. for Summ. J. (hereinafter "Def.'s SJ Reply") at 3–6 (Clerk's No. 117–2). According to EnSoft, the accused products

"operate[ ] on non-executable graph representation of programs" and thus "cannot infringe ... as a matter of law." Def.'s SJ Br. at 2. However, the fundamental premise of EnSoft's motion is not supported by the prosecution history. As discussed above, National Instruments did not disclaim—clearly or otherwise—the differencing of "graphical representations of programs." *See supra* Section III(A)(1)(a)(i). Rather, it disclaimed the differencing of graphical representations of *textual* programs.[22] *See id.; see also* Def.'s App. at 2540038–40. Therefore, because the fundamental premise of EnSoft's argument is incorrect, EnSoft has not demonstrated that it is entitled to judgment as a matter of law.[23] *See generally* Fed.R.Civ.P. 56.

## IV. CONCLUSION

For the foregoing reasons, "Defendant's Motion for Summary Judgment" (Clerk's No. 93) is DENIED.

IT IS SO ORDERED.

---

EnSoft offers no support for these bare, conclusory assertions.

21. Indeed, EnSoft makes no effort to contradict or rebut National Instruments' citation to the claim language. *See* Def.'s Markman Br. at 15–16.

22. Additionally, contrary to EnSoft's assertion, National Instruments did not argue during reexamination "that *directly* differencing graphical programs was the key to distinguishing its claims from the prior art references." *See* Def.'s SJ Reply at 4 (emphasis added). Not only is this assertion unsupported by any fair reading of the prosecution

history, but it is also—and National Instruments correctly points out—contradictory to the plain language of the representative claim. *See* Clerk's No. 124 at 3 (citing Def.'s App. at 2540003).

23. To the extent that EnSoft is arguing that the accused products are "just like the prior art" that National Instruments distinguished during prosecution, *see, e.g.,* Def.'s Reply Br. at 6, EnSoft has failed to demonstrate that there is no genuine dispute as to this factual contention. *See generally* Clerk's No. 124 at 8–9 (discussing some of these disputes).